**PROPERTY TAX REPRESENTATIVES, INC., Appellant,**

v.

**Jerry W. CHATAM and Concorde Associates of Kentucky, Respondents.**

**No. WD 48873.**

Missouri Court of Appeals, Western District.

Jan. 17, 1995.

Gregory M. Garvin, Kansas City, for appellant.

James R. Borthwick and Price A. Sloan, Kansas City, for respondents.

Before KENNEDY, P.J., and BRECKENRIDGE and SPINDEN, JJ.

KENNEDY, Presiding Judge.

Property Tax Representatives, Inc. (hereinafter referred to as PTRI), appeals from the trial court's judgment in favor of its discharged employee, Jerry Chatam, in PTRI's suit against Chatam based upon Chatam's alleged breach of the non-competition and non-solicitation agreements of his employment contract with PTRI. PTRI sought an injunction to prevent Chatam's continued employment by PTRI's competitor, Concorde Associates, Inc., and also sought damages both from Chatam and Concorde Associates.

PTRI was in the business of representing property owners in seeking reduced valuations of property for ad valorem tax purposes. This enterprise involved the appraisal of the property in question, and the representation of the property owners before the taxing officers and agencies. If it was successful in gaining a reduction in ad valorem tax valuation, it received for its services a contingent fee based upon the savings achieved by its efforts. It plied its business in the greater metropolitan Kansas City area, including Platte, Jackson, Cass and Clay counties in Missouri and Wyandotte, Johnson, Douglass, Shawnee, Sedgewick and Leavenworth counties in Kansas. PTRI also does consulting in the states of California, Michigan, Iowa, Nebraska and Arkansas.

Jerry Chatam, a certified appraiser, was employed by PTRI in 1989. He began work for it in June, 1989. His beginning salary was $32,000 per annum. At the time of his discharge on April 30, 1992, his salary had increased to $38,000 per annum. Also at the time of his discharge, he was in line for a bonus of $14,793.48 for his 1991 work, but the employment contract provided that this would be payable on July 1 of the following year, if the employee was still in PTRI's employ at that time. Because Chatam was discharged as of May 15, 1992, he was not eligible for the bonus payment when payment time came. During Chatam's employment with PTRI, his title was changed to "valuation consultant." Fred Coulson, who owned PTRI and was its chief operating officer, testified that the reason for this change was in order that one person would be in contact with the client and would be in charge of all aspects and stages of the valuation-reduction campaign, from start to finish.

At the time Chatam became a PTRI employee, he signed an employment contract which contained non-competition and non-solicitation provisions. During the three-year time of his employment, he signed two others, each taking the place of the earlier one. The last one, the version which is controlling here, was dated March 18, 1992. It obligated him, for two years after termination of his employment with PTRI, not to enter into competition with PTRI. The precise language of the non-competition and the non-solicitation clauses need not be copied here, for Chatam does not dispute that his employment by Concorde Associates, Inc., is in violation of the agreement. His position is that the agreement is not enforceable by injunction as against him because he was discharged by PTRI, without good cause, and did not quit voluntarily.

## NON–COMPETITION AGREEMENT

In the spring of 1992, Chatam performed a fee appraisal for Mr. and Mrs. Nosti on four

tracts of real estate. The Nostis were PTRI clients, and Chatam had done the ad valorem tax work on these same four pieces of property. The fee appraisal done by Chatam for the Nostis did not involve tax valuation; it was for Bank IV, to which the Nostis had evidently applied for a loan, for which the real estate was to be given for security. Chatam did this fee appraisal on his personal account, not in behalf of PTRI. He hired a typist to type it who was not an employee of PTRI. The typist did not use PTRI equipment. Chatam received $1200 from the Nostis for his work, from which he netted approximately $600 after the payment of expenses. Mr. Coulson testified PTRI did not do fee appraisals, the kind Chatam had done for the Nostis, and that if he, Coulson, received a request for that kind of appraisal, he would refer the person to another group who did that kind of work.

It is not claimed that Chatam had ever, during the time he had been at PTRI, done an appraisal on his own account before this time. Chatam testified that Mrs. Nosti had requested him to do the appraisal, that he had at first demurred, but at length, he had yielded to her importunity.

·When Mr. Coulson learned about the Nosti appraisal by Chatam, he discharged him, after first giving him an opportunity to resign. When Chatam undertook to justify to Coulson his making the fee appraisal, Mr. Coulson said, according to Chatam's testimony: "Well, I can fire you for this reason; I can fire you for any reason. I can fire you for no reason. I'm just letting you go." PTRI did, however, send Chatam a certified or registered letter advising him he was terminated, and paid Chatam's salary for an additional two weeks (up to May 15, 1992). This, according to Coulson's testimony, was referable to a provision in the employment contract which allowed either party to terminate the contract on 14 days' notice. The letter is not in the record.

Chatam argues that his fee appraisal for the Nostis was permitted by the employment contract. He points to paragraph 6, which says:

> 6. *DUTY TO ACT DILIGENTLY.* During the period of the Employee's employment, the Employee shall devote all of the Employee's business time, attention, skill and efforts to the faithful performance of the Employee's duties hereunder; provided, however, that the Employee may engage in casual transactions and investments not in competition with the Corporation, so long as these activities, in the sole opinion of the Corporation, do not detract from the Employee's ability to perform this Agreement. The Employee shall carry out any lawful instruction of the Corporation and not act in any manner disloyal to the Corporation.

PTRI points to the same paragraph, but it emphasizes the part that limits the "casual transactions" permitted to employees to those which "in the sole opinion of the Corporation, do not detract from the Employee's ability to perform this Agreement." PTRI also says that Chatam's appraisal for the Nostis violated a "lawful instruction of the Corporation" not to engage in fee appraisals.

■ It is a central issue in this case whether PTRI had "cause," or "sufficient cause," or "good cause" to discharge Chatam.[1] If PTRI had cause for Chatam's dismissal, then *Showe–Time Video Rentals, Inc. v. Douglas,* 727 S.W.2d 426, 431 (Mo.App. S.D.1987), indicates that it is entitled to an injunction to enforce its non-compete agreement. On the other hand, if the employer discharges an employee without cause, a court of equity may, in the exercise of its discretion, refuse to aid the employer in enforcing the employee's non-compete agreement by injunction.

■ The "cause," or "good cause," or "sufficient cause" that justifies dismissal of an employee is not a sharply delineated concept. *Superior Gearbox Co. v. Edwards,* 869 S.W.2d 239, 249 (Mo.App.S.D.1993). There

---

1. This paragraph is significant only with respect to the issue whether PTRI's discharge of Chatam was "for cause." As we note infra, there is no question that the discharge was permitted under the employment contract, whether with cause or without cause. In case of discharge for cause, no notice was required; Chatam could be fired on the spot. If the discharge was not for cause, the employee was entitled to two weeks' notice. PTRI gave Chatam the two weeks' notice.

are cases where the presence or absence of cause for discharge, upon given facts, is indisputable, and in those cases the court may decide the issue as a matter of law. *See, e.g., Craig v. Thompson,* 244 S.W.2d 37, 43 (Mo. 1951); 53 Am.Jur.2d, Master and Servant § 70 (1970).

■ In this case, we are unable to say as a matter of law that Chatam's dismissal was for cause. It was the trial court's duty to determine, from the evidence before it, whether good cause existed for Chatam's dismissal. The court found that the fee appraisal performed by Chatam was expressly allowed by the employment contract, in that it was a "casual business transaction, not in competition with PTRI," and that Chatam's discharge was without good cause.

PTRI argues the discharge was, as a matter of law, for cause. Coulson testified: "We feel it opens us up to potential liability if we were to get involved in doing the appraisals for financial institutions.... We also utilized comparable information that we've licensed from (Kevin K Nunnink and Associates, Inc.).... [A]nd we agreed as part of them providing us with this comparable information not to use it for fee appraisal work, also concerned [sic] about just the potential problems that arise as far as a conflict of interest or perceived conflict of interest if we were to be doing the price work for a client, and also doing contingency work for them in their ad valorem tax area."

It is to be noticed that PTRI makes no claim that the Nosti appraisal was in competition with PTRI, or that it in any way interfered with Chatam's performance of his obligations to PTRI. That being the case, Chatam's offending fee appraisal is not taken out of the category of "casual transactions" permitted by paragraph 6 of the employment contract. Chatam testified, in testimony which the trial court could choose to believe, that no ban on fee appraisals by PTRI appraisers was ever communicated to him, and that he had foreseen no problem with PTRI in doing the appraisal.

What Mr. Coulson describes as the dangers of permitting PTRI's appraisers to do fee appraisals like Chatam's for the Nostis, would no doubt furnish grounds for the promulgation of a policy banning fee appraisals by PTRI appraisers. But the evidence supports the trial court's conclusion that the violation of a policy that existed only in Mr. Coulson's mind did not justify Chatam's discharge as a discharge for cause.

■ Besides Chatam's making of the fee appraisal, Coulson said that Chatam's unauthorized use of comparable sales data, licensed to PTRI by Nunnink and Associates, put PTRI at risk of some liability under its license agreement with Nunnink. Coulson said the Nunnink data was licensed to PTRI for its use in tax valuations. Chatam's own testimony, which the trial court could believe, was that he by his own independent efforts had gathered, from other sources, all the information included in the Nunnink and Associates research. He had attached the Nunnink and Associates comparable sales information to his appraisal report because it was in convenient and accessible form. He said the data was freely exchanged among appraisal firms. Apparently Nunnink never made any complaint to PTRI about Chatam's alleged unauthorized use of the comparable sales data. Coulson did not know about Chatam's use of the Nunnink data at the time he discharged him; he discovered that only later. We are unable to say the trial court was in error in rejecting Chatam's use of the Nunnink data, by itself or in conjunction with the making of the Nosti appraisal, as constituting good cause for his discharge. We hold, as Chatam's discharge was without good cause, as found by the trial court upon sufficient evidence, that the trial court acted within its discretion in holding that the non-competition clause was unenforceable. *Showe–Time,* 727 S.W.2d 426.

We observe that the court in *Showe–Time* emphasized the plaintiff's seeking relief by the equitable remedy of injunction, and held that the trial court was within its discretion in denying the equitable remedy. In case of reversal and remand, though, PTRI's remedy *now* would be for damages in lieu of the injunction. That is because the injunction claim, as we explain hereafter with respect to the non-solicitation agreement, would now be moot; the two-year term of the non-competi-

tion agreement has now expired. Now that PTRI could claim only damages, do different considerations require a different result because the remedy being sought is not an injunction, but damages in lieu of an injunction? While there may be instances in which equity would permit a different result, we see no reason why a different result should obtain here. Upon remand, the case would remain an equity case, and many of the same equitable considerations which denied the injunction remedy in *Showe–Time* would also deny the damage remedy.

## NON–SOLICITATION AGREEMENT

The employment contract prohibited Chatam, not only from competing with PTRI for a period of two years after termination of his employment, but also from soliciting PTRI clients' business for the same period.

The trial court did not differentiate between Chatam's non-competition obligation and his non-solicitation obligation, holding that neither of them was enforceable because Chatam was discharged without good cause.

■ We think the non-solicitation provision of the contract stands on a different footing than the non-competition provision. The non-solicitation agreement prohibits the use by the employee of contacts with the employer's clients and their good will, with all that is implied in that term, and of knowledge of the clients' business, which the employee has gained while in the employer's employ. The employee's relationship with the client he owes to the employer, and he holds it in a kind of fiduciary capacity for the employer. *Mills v. Murray*, 472 S.W.2d 6, 12 (Mo.App.1971). It is perfectly fair, for a limited time after the termination of the employment, to prohibit his using that relationship for his own benefit, and for the benefit of a competitor of the employer, to the employer's detriment.

■ In so holding, we note that, while Chatam's discharge was without good cause (so that his agreement not to compete may not be enforced), it was not wrongful. PTRI was within its legal rights to discharge Chatam; there is no claim to the contrary. If Chatam's discharge had been wrongful, we express no opinion about the enforceability of the non-solicitation provision. But that is not our case.

■ PTRI's claim for injunction is now moot. *See American Pamcor, Inc. v. Klote*, 438 S.W.2d 287, 291 (Mo.App.1969). The prohibition against Chatam's solicitation of PTRI's clients came to an end two years after Chatam's discharge on May 15, 1992. When an injunction is granted to enforce a non-competition or non-solicitation agreement, the term of the injunction begins with the date of termination, not the date of the judgment. *Superior Gearbox*, 869 S.W.2d at 246. The case will be remanded to the trial court to determine the damages, if any, which PTRI suffered as a result of any breach by Chatam of the non-solicitation agreement.

## CIVIL CONSPIRACY CLAIM

■ Concorde Associates, Inc., is also a defendant. PTRI's claim against Concorde Associates is that Concorde entered into a civil conspiracy with Chatam to do an unlawful act, namely, for Chatam to breach his non-competition/non-solicitation contract with PTRI.

The trial court made the following fact findings with reference to PTRI's civil conspiracy claim:

26. Defendant Concorde Associates, Inc. *performs* similar tax consulting services as PTRI and is a competitor with PTRI in the Kansas City metropolitan market.

27. Concorde Associates' · president is Mark T. Hill.

28. Concorde Associates hired Jerry Chatam in June 1992, six weeks after PTRI discharged Chatam, and Jerry Chatam was Concorde Associates' first employee in Kansas City.

29. Prior to hiring Chatam, Concorde Associates knew of Chatam's non-compete agreement with PTRI. Chatam gave Mark Hill a copy of the PTRI employment contract and discussed the employment contract with Mark Hill. Further, Mark Hill is familiar with non-compete agreements and was involved in litigation with

his former employer regarding an alleged breach of his own non-compete agreement.

30. Concorde Associates did not seek any legal counsel and did not do any investigation regarding the validity of the contract prior to hiring Chatam.

31. Concorde Associates did not seek PTRI's waiver of the non-compete agreement.

32. Chatam's duties with Concorde Associates involve the active solicitation of clients for Concorde in the Kansas City metropolitan area to perform appraisals for ad valorem tax appeals and to represent Concorde Associates' clients before tax appeal bodies.

33. During the course of Chatam's employment with Concorde, Chatam has been involved in sales calls and directly or indirectly solicited several former PTRI clients including Executive Hills South, Olathe Manufacturing, Juan and Nancy Nosti, Income Properties, and Varnum/Armstrong/Deeter.

34. Chatam was the PTRI Valuation Consultant and had substantial customer contact with Executive Hills South, the Nostis and Income Properties during his employment with PTRI.

35. Executive Hills South, Olathe Manufacturing and the Nostis are now clients of Concorde Associates, Inc.

36. Concorde has received profits of $10,413.95 on the Executive Hills and Olathe Manufacturing accounts.

No one claims these findings are not supported by the evidence.

■■■ The facts found by the court, based upon evidence before the court, establishes a cause of action in PTRI's favor against Concorde Associates. A civil conspiracy is proved by evidence that two or more persons have an agreement or understanding to do an unlawful act, and that, in pursuance of this agreement or understanding, they proceed to carry out their unlawful purpose to the damage of the plaintiff. *Mills v. Murray*, 472 S.W.2d 6, 12–13 (Mo.App. 1971). In *Mills*, this principle was applied where the unlawful act was the breach by a former employee of the plaintiff of the for-

mer employee's undertaking not to compete with the plaintiff, or not to solicit plaintiff's customers; and the co-conspirators were the plaintiff's former employee and his new employer. *Mills*, 472 S.W.2d 6. Both were held jointly and severally liable for the damages to the former employer. *Id.* at 12. Of course, the new employer must know of the non-competition or non-solicitation agreement, but Concorde Associates' knowledge of Chatam's non-solicitation agreement is unmistakably clear in this case, and is not denied.

Mark Hill did not distinguish between the non-competition and the non-solicitation agreements, and supposed, on the basis of his own experience and knowledge, that neither of them was enforceable, because Chatam had been discharged by PTRI.

As a defense to PTRI's damage claim against it for civil conspiracy, Concorde Associates says it acted in the good faith, if mistaken, belief that Chatam's non-competition and non-solicitation agreements were unenforceable. Concorde's mistake was a mistake of law. Concorde Associates' good faith belief about the lawfulness of Chatam's act, however, furnishes no defense to PTRI's civil conspiracy claim for damages. Concorde Associates knew the facts of Chatam's employment by PTRI, knew of the termination, and knew of the terms of the non-solicitation agreement. Concorde Associates and Chatam agreed to adopt a course in direct violation of Chatam's obligations under his contract with PTRI. The fact they misjudged the legal effect of the facts cannot furnish any defense, at least as to compensatory damages.

■■■ The Chatam–Concorde Associates conspiracy was for the purpose of doing the unlawful act of breaching (by Chatam) Chatam's non-solicitation agreement with PTRI, and (by Concorde Associates) of aiding Chatam in his breach of the PTRI contract, and interference by Concorde Associates with Chatam's agreement not to solicit PTRI's customers. The conspiracy itself is not actionable; the unlawful act done in pursuance thereof is actionable, and the conspiracy has to do only with the joint and several liability

of the co-conspirators. *Blaine v. J.E. Jones Constr. Co.*, 841 S.W.2d 703 (Mo.App.E.D. 1992). With reference to interference with contract, Restatement (Second) of Torts, § 766, cmt. i (1979) says:

[I]t is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract. If he knows the facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have.

We remand the case to the trial court to determine damages to PTRI caused by Chatam's breach of his agreement not to solicit PTRI's customers. In the assessment of damages, the trial court may consider defendants' claim that the agreement not to solicit is more extensive than is reasonably required for the protection of PTRI's legitimate business interests. No damages should be assessed for any solicitation of PTRI customers whose solicitation is unreasonably prohibited by the contract.

Judgment reversed and cause remanded for further proceedings in conformity with this opinion.

All concur.